We'll now take up 21-4133 U.S. v. Pehrson. It's Citizens v. U.S., now it's U.S. v. just one person. Sorry. Ms. Johnson, are you ready? This is Freya Johnson for the appellant, Mr. Nathan Pearson. Pearson. I think it's Pearson. Okay. Sorry about that. Mr. Pearson was convicted of three charges related to allegations that he had improperly diverted a controlled substance known as hydromorphone, which goes by the trade name Dilaudid, while he was employed as a nurse. On appeal, he challenges two rulings that the district court made to admit certain testimony two particular witnesses, Dr. Ryan Paulson and Dr. Richard Cox. The testimony of Dr. Paulson concerned, the challenge testimony of Dr. Paulson concerned a study he performed that dealt with the ratios of hydromorphone to hydrocodone. And so in this particular case, Mr. Pearson had some drug tests performed on hair samples that showed positive results of minute amounts of hydromorphone, which can show positive when you've ingested Dilaudid. But hydromorphone is also a metabolite or a byproduct of the body metabolizing another substance known as hydrocodone. And Mr. Pearson had a valid prescription for the drug hydrocodone. So the government sought to have Dr. Paulson testify that based on a study he had performed, the ratio of hydromorphone to hydrocodone in Mr. Pearson's test supported that he had ingested Dilaudid rather than that the hydromorphone was the byproduct of his body metabolizing hydrocodone. So the defense raised various challenges to the reliability of Dr. Paulson's testimony and the district court ruled on those at the beginning of trial. One of the challenges is the subject of this appeal, and that's the court's ruling that even though the study that Dr. Paulson based his testimony on had no samples containing less than two nanograms of hydrocodone in the data set in which it made its conclusions about ratios, that that did not prevent the doctor from forming a reliable opinion based on that study as to Mr. Pearson's samples, which did contain less than two nanograms of hydrocodone. So in the particular study, which was a peer-reviewed study, the data set that was relied on in that study all, for the ratios, all contained samples of hydrocodone that had more than two nanograms, which is the laboratory's confirmation cutoff for drug testing. But Mr. Pearson's samples had less than two nanograms. Let me ask you this. What is the significance of a cutoff? It's at least, to my understanding, that relates to the question of determining whether somebody is a regular or typical user of a drug. Is that not right? Yes, Your Honor, I believe that's correct. Dr. Paulson testified at an evidentiary hearing about the difference between a detection limit cutoff and a confirmation cutoff. The lab's detection cutoff is 0.5 nanograms, and its confirmation cutoff is two nanograms. And he said the difference between detection and confirmation goes to the conclusions that can be drawn about drug use. Well, to that point, Dr. Paulson is not and did not try to draw a conclusion of typical drug use. He did not try to say that the confirmation cutoff was met here as it relates to the defendant. He said some, any. In other words, the notion was his conclusion was he took some hydromorphone. He didn't try to say that he regularly takes hydromorphone, that he's a typical user of hydromorphone. He said he took some. So why would that not be a reliable inference, since he is not trying to track a one-to-one, based upon a confirmation checkoff, I mean cutoff, of why it's a different, his opinion in short, related to a different purpose than the confirmation cutoff. Yes, he did not testify that the testing for Mr. Pearson met the confirmation cutoff. You're correct. He testified that based on the ratios of hydrocodone to hydromorphone, that Mr. Pearson had most likely ingested Dilaudid rather than that his body had just metabolized hydrocodone. And that he wasn't a typical, he didn't try to say that he was a typical user of Dilaudid. He just said he ingested some. That's correct. He said the sample amounts were too small to say whether he was a typical user. Okay, and so what's unreliable about that, because that, for purposes of the government's proof, was all they needed to do is show he took some. Yes, but Dr. Paulson's testimony and his opinion that Mr. Dilaudid, or I'm sorry, Mr. Pearson had ingested some Dilaudid, was based on a study that was limited to samples that contained more than two nanograms of hydrocodone. And the testimony from Dr. Paulson both showed that there was no peer-reviewed data on ratios of hydromorphone to hydrocodone in samples under two nanograms. His peer-reviewed study only dealt with samples containing more than two nanograms. It also called into question whether ratios could be reliably calculated and whether they would be the same in samples under two nanograms. He was pretty close to two nanograms, was he not? In one instance 1.9, the other 1.8 or something like that? That's correct. Okay, well, what basis is there to believe that he could not extrapolate from such a close, and that's what the district court found, given such a close connection, why couldn't he extrapolate? And I guess the district court used the word shaky. Well, shaky would imply that he could not say that this is a one-to-one match. But what basis is there to believe it wouldn't be reliable for him to say that it suggests to me some usage? Dr. Paulson testified that under two nanograms his lab had an uncertainty of measurement, but he couldn't testify about what that uncertainty of measurement was or how it might affect the calculation of ratios for under two nanograms. So in Mr. Pearson's samples, we have two test results, both of which were under the confirmation level, the hydromorphone result and the hydrocodone result, and then he calculated ratios and relied on study of ratios in samples of hydrocodone over two nanograms to draw conclusions about Mr. Pearson's samples and whether the ratio indicated that he had ingested a lot of it. And uncertainty of measurement of what? He said that Dr. Paulson testified at the evidentiary hearing vaguely on that point. He said that there was an uncertainty of measurement in his laboratory for samples under two nanograms, but that he couldn't say what that uncertainty of measurement was. Well, if the uncertainty of measurement goes towards the question of whether the defendant is a regular user of hydromorphone, which is what I interpreted that to mean, then yes, that's right. I mean, because that's not what he opined on. And so I guess what I'm trying to understand is if you have a gap, okay, you have the study. The study goes with the two nanogram cutoff, and that study's objective really under the two nanogram cutoff is to show typical usage. Okay? He testified of hydromorphone. He was a regular user of hydromorphone. I thought that's what I understood you to say, the cutoff signifies. Okay. The cutoff does. The study does. All right. Well, the cutoff. All right. The usage of the cutoff in that study shows that. Okay? You don't have that cutoff here. And he says, okay, well, I don't have that cutoff here. I have it close. I cannot go as far as the study's conclusions because I don't have a confirmation cutoff here. But what I can say is he took some. Well, he didn't limit his opinion to anything less than the study's conclusions. Well, he did because he said, I opined that he took some Dilaudid. Not that he was a typical user, not that he met the confirmation checkoff cutoff, but that he used some. Correct. But the analysis in the study that he relied on wasn't about being a typical user. It was about whether the ratio of hydromorphone to hydroponin indicated that hydromorphone had been ingested rather than was a metabolite. So his study didn't deal with the question of typical users, and his testimony didn't either. But he relied. The problem isn't in confirmation levels in isolation. The problem is that he relied on a peer-reviewed study with a data set that didn't include Mr. Pearson's samples in drawing a conclusion about the ratios in Mr. Pearson's samples. And so there was no peer-reviewed data supporting his opinion regarding Mr. Pearson's samples, which were both under this cutoff level and contained less than the two nanograms of the data set relied on in the study. In addition, his testimony did not indicate that you could reliably draw the conclusion that the ratios would be the same in such small samples. Because he said that typical ratios of hydromorphone to hydropodon were only 1% to 2%, in samples of two nanograms or less of hydropodon, the amount of hydromorphone would likely be undetectable. Dr. Paulson testified to that at trial, and he said that in a sample of this size of Mr. Pearson's size, he would actually have expected a typical ratio, that the hydromorphone wouldn't have been detectable at all. Yes, Your Honor. You've assumed something so far in your argument that I think is incorrect. The samples taken from Mr. Pearson would have satisfied the criteria for his study, would they not? Not because it wasn't 2.0 nanograms of hydromorphone that was necessary. It was 2.0 nanograms of opioid. And when you combine the opioid of the hydromorphone and the hydrocodone, I'm probably screwing up on the, that's right actually. I think that's correct. That was more than 2.0 nanograms. So if his samples had been submitted for his study, they would have been valid samples that would have been looked at then. So no one with his, or maybe a tenth of a percent or something, of the samples that were looked at in his study had as high a ratio as Mr. Pearson's samples. But his samples would have been within that study. To say it has to be 2.0 of hydromorphone is not correct. It's 2.0 nanograms of an opioid. So you had both of the opioids tested with him. Am I missing something there? Yes, Your Honor. Dr. Paulson did give some testimony at trial, not at the evidentiary hearing on which the district court based its ruling, but he subsequently gave some testimony at trial that the combined amount of controlled substance could result in Mr. Pearson's sample being, what he said, screened into the study. But he's talking about the screening and confirmation process, which has to do with how the samples were tested before the samples were analyzed. So it would have been in that group, and it would have passed the threshold to be in his study, and no, I think it was no, but at least a very, very small percentage of the samples in the study showed the ratio of hydromorphone to hydrocodone that his samples did. So his study is very probative of the fact that the ratio found for Mr. Pearson was highly unlikely, maybe not impossible, but highly unlikely. Nobody metabolizes that high a percentage of hydrocodone into hydromorphone. That's not an accurate account of the study, and so let me just clarify, because that is a bit confusing. Dr. Paulson did testify that conceivably Dr. Pearson's sample could have been screened into the study. It could have passed the screening process. Not conceivably, but would have. I think he was a little more equivocal than that, but let's assume he would have. Okay. There's still no data that the study relied on in its analysis of ratios with samples of hydrocodone less than two levels. So to clarify, in the review of the article, it says that the analysis of hydrosample, I'm sorry, ratios of hydrocodone to hydromorphone says that the comparison of the tables reveals the removal of over 11,000 hydromorphone head samples and 4,666 body samples containing no hydromorphone above the level of detection, LLQ, level of confirmation, I think. So what that indicates is that not all samples screened into the study showed up in each part of the analysis. Right, right, right. But that hurts your client. Because if there was no case that was screened where they had less than 2.0 nanograms of hydromorphone or hydrocodone, I'm going to get confused, then that shows that no one would say 1.9 of hydromorphone, of hydrocodone. Thank you. Would have had a high enough amount of hydromorphone to pass the screening. So it just, what he's saying just confirms that it's almost none in the study had enough hydromorphone to add to the hydrocodone to pass the screening test. Well, the screening test is not the basis of the analysis of the ratios. The ratios give their data in these various figures and tables. And the district court made a finding when it ruled on this objection to Dr. Paulson's testimony that the study did exclude hydrocodone samples that were below 2 nanograms per 10 milligrams of hair. It made that finding and based its ruling on that finding, and that finding is correct. The data, the peer review data, the article itself that deals with the ratios of hydromorphone to hydrocodone only considers ratios in samples with more than 2 nanograms of hydrocodone. And so there is just no data on what ratios would exist for samples with less than 2 nanograms of hydrocodone and whether they'd be the same. No, it shows that when it says there's no data, what it is is there's no data that there's that low, that there's that high a ratio of hydromorphone to hydrocodone. Because if there were anyone with a ratio like that, then you'd just need 1.9 nanograms of hydrocodone. You'd get enough hydromorphone that it would have been in the study. Well, I think there's a little confusion about ratios versus the amount of the substance. The ratios is a different question. You'd calculate the two substances and compare the amount of one and the other. And Dr. Paulson did testify that there were some other what he called outliers like Dr. Paulson, or sorry, Mr. Pearson, that had even higher ratios in his study. So there were some higher ratios. The problem is that in the data that the peer-reviewed study relied on, the data set solely consisted of samples containing more than 2 nanograms of hydrocodone in assessing the ratios and comparing the ratios. So there is no data on ratios in samples containing less than 2 nanograms of hydrocodone in this peer-reviewed analysis of ratios on which he based his testimony. Okay, I want to move on to Dr. Cox, but I want to be clear on just quickly to tie a bow on this. So your point is simply that even if you could get into the screen into the study by having a combination of opioids that each will equal 2 nanograms, when as it relates to the analysis of the ratios, there wasn't any data within the analysis that went below 2 nanograms of hydrocodone? That's correct, yeah. Okay. All right, now as it relates to Dr. Cox, what I'm somewhat struggling with is when I look at the LifeWise case, I like to do a little compare and contrast between that and James River, because it seems to me that one could argue that Dr. Cox testified that he regularly deals with diversion, he regularly deals with this ADM data, and he made a conclusion after doing that, that this is very different, that there's something going on here, presumably diversion. Well, that is not what happened in LifeWise, where you had a business executive who had all of these models, which he testified, I haven't done these models, I don't recall doing these models, but I testified about them. And so we said that was expert testimony. Well, Dr. Cox does do these, you know, try to call it models or whatever, he does deal with this. This is what he does. That's his job. And so why isn't he speaking from his basis of perspective of doing his job and making those conclusions? The question about whether his testimony was lay testimony or expert testimony turns on whether it's based on specialized knowledge or training. So a lay witness, a lay person can offer a testimony, including an opinion, based on inferences and observations, so long as that opinion is not based on specialized knowledge or training. Well, the point I'm making is that as part of his job of doing this, there is no, he is saying this is the, it's based on my rational perception from doing this job and analyzing this data, this is what I do. I mean, you can find a jury that would not be able to calculate what my business grows output on my job, but I do it, and that's deemed to be 701 testimony. Well, why isn't this 701 testimony when Dr. Cox, this is not, the point I was trying to make is, this isn't like Likewise, where you brought in some guy who could do the models, but he doesn't do them every day, and then he presents these complicated models to the jury and says this is lay testimony. This is a guy who does this every day, this is his job. And he says, well, I've looked at this stuff, I do this every day, and this is very different. It is different in that respect, in the respect that he does look at these models, including the software results and that he examines, he testified that he examined dispensing patterns himself for red flags. But the question isn't whether his observations are based on his work or not. The question is whether they're based on specialized knowledge. So some work could allow for lay inferences. If I clean and I notice that people regularly litter in a certain location, certainly that would not be based on specialized knowledge. It's something that anyone could observe and notice. But Dr. Cox's own testimony supported that his opinions regarding red flags and whether red flags indicated diversion was based on expert testimony rather than his own observations. He didn't say, from my own observations of employees who diverted, I've developed my own list of red flags or things I look for. Instead, when he was asked about red flags, he said they're the studied and identified trigger points that usually lead to indicating that someone is diverting medication. Yes, but he didn't refer to any specific study. He said that there are studies that show this. I mean, that's part of my job. I know this is how it's done, and this is what I analyzed. I mean, what I understood from the rule, and this is where you can correct me, of course, what I understood from the rule is the point is, is this based upon the rational perception of an individual who's engaged in this activity, or are they importing some specialized knowledge to do it? Well, this is based upon his rational perception in doing the job. Of course, there's some scientific background to diversion, but, I mean, there's scientific accounting principles that go into play when one does a business output determination. Well, I do that determination. It's my job. That's what I do, and I'm telling you what the figures show. Why is this any different? When a witness offers an opinion that's based on that specialized knowledge rather than on something that any lay person could observe, then the testimony moves from the realm of lay witness testimony to expert witness testimony. So here, when he testified regarding the situation, his testimony wasn't based on saying something, for instance, like, my opinion is Dr. Pearson dispenses at a higher rate than his colleagues. That's something that anyone could see from looking at the record. Instead, he gave the opinion that the red flags in this place, sorry, that this case was a case in which there was diversion, and this was very different from those cases in which there are red flags but no diversion, which he recognized. What exactly did he say? I thought he said there's something very unusual going on here. He didn't say diversion, did he? He said, quote, this was very different, and it was very clear that there was something going on. Right. The advisory committee notes to Rule 701 say we should consider something lay testimony if it uses a process of reasoning familiar in everyday life. And when he explained why this set off red flags, he was using reasoning that anyone could understand. He was taking, he was keeping the drugs for an hour when other people were returning it promptly. When he saw a patient, that patient was getting a lot more deluded than the other nurses were giving. Those don't require any special expertise where you have to defer to this person's specialized knowledge. The information he got was something I would think any lay person could evaluate. Why is it, it's very similar to the point that Judge Holmes was making, but this is why, this is another reason why this was admissible, it would seem to me, as lay testimony. How do you respond to that? The record indicates that the red flags and the triggers that indicate diversion aren't necessarily things that are common knowledge. They talk about behaviors like they called wasting, which involves the disposal of medication if it's not administered properly or if you need to reduce the amount from the syringe to the amount that needs to be administered. Things like that. But once he explains that, and that people can, someone misusing the drug could replace the water with saline solution, once that's explained, the method of reasoning, that's the language in the advisory committee, the process of reasoning is very standard common sense sort of stuff, is it not? Well, the rule indicates that when any part of a witness, and this is the advisory committee note I'm quoting now, when any part of a witness's testimony is based upon scientific, technical, or other specialized knowledge, that testimony is not lay testimony. So if someone forms an opinion based on specialized knowledge and training, rather than just the lay observations that any person could make, then that testimony is then an expert opinion. Even if all the testimony is that you can replace, you could use the lauded and make it seem that there's, that you hadn't diverted anything by just adding saline solution. That makes it expert knowledge that you need an expert witness to testify about. If it's based on his specialized knowledge and training concerning diversion, which in this case he testified it was, they're the studied and identified trigger points. They're the literature on diversion. In addition, the HR manager talked about the confrontation meeting, and that meeting they confronted Mr. Pearson with data that was based on what Dr. Cox originally had studied, the diversion triggers that he identified, and then he passed it on to this team and was out of town for the actual meeting. But she testified that Mr. Pearson was to take the allegations in blind faith, quote, based off of trust of the person who was explaining it to him, who was an expert in his field. So throughout, there is no indication in the record that a lay person can make observations about whether the red flags indicated that someone's actually diverting, rather than just that the computers identified red flags, which could or could not identify, or could or could not support diversion. And Dr. Cox otherwise testified there are cases where there may be red flags, but no diversion. And so to that point, when Dr. Cox gave this objected to statement, he was saying, he was responding to the idea that this is not a false positive. This is very different. In other words, saying that even though there could be instances where the computers would show, the machine would show red flags, but it would not be diversion, that's not one of these cases. So the distinction is important, I take it. That's correct. I see that my time is far gone, so there are no other questions. Good morning, and may it please the Court, Jennifer Williams for the United States. The jury's verdict in this case was supported by overwhelming evidence that Mr. Pearson diverted hydromorphon on the night of April 13th. Nevertheless, on appeal, Mr. Pearson alleges that the district court abused its discretion in admitting two particular pieces of evidence. The expert testimony of Dr. Paulson, that Mr. Pearson separately ingested hydromorphon and hydrocodone, and the lay opinion of Dr. Cloutz, that it was very clear that something was going on with Mr. Pearson's dispensing of hydromorphon. Mr. Pearson is wrong on both counts. The district court did not abuse its discretion in admitting either the testimony of Dr. Cloutz or Dr. Paulson. But even if it did, any errors were harmless, as neither piece of testimony made the difference in Mr. Pearson's convictions. Dr. Paulson's testimony that Mr. Pearson separately ingested hydromorphon and hydrocodone. The district court did not abuse its discretion in admitting that particular part of the testimony. In short... Ms. Williams,  I have a question on the Daubert issue as to Paulson. It indicated that the concentration question, that being slightly below the minimum concentrations of the samples in the study, it said, the court said, at most, this fact makes the testimony somewhat shaky. That disturbs me. I don't see how someone's testimony should come in, if the person who's exercising discretion says that it's somewhat shaky. Well, as the district court then goes on to explain, the proper method... The default is that expert testimony comes in. Unless... And the proper method for most expert testimony... Wait, wait, wait, let's not talk about defaults. We're having a Daubert hearing. And the determination is, is this testimony going to come in? And the person exercising discretion saying that under the circumstances with the study regarding the concentrations of hydrocodone, being slightly below the concentrations in the samples in the study, says that makes the testimony somewhat shaky. Now, we don't let somewhat shaky testimony come in after a Daubert hearing, do we?  And how shaky it is. In this case, as the district court then went on to explain, the proper method... While the district court found the testimony somewhat shaky, it said, the proper method for determining how reliable the evidence is, how reliable the testimony is, is through cross-examination. And it will be a question for the jury. How much weight to give to that evidence. I'm back at the Daubert hearing. He's supposed to be a gatekeeper, this judge. And he's saying, the gates are open, even though the testimony is somewhat shaky. You've got to address the Daubert issue before you ever get to, well, it's up to the jury. Because the very purpose of these Daubert hearings is to make sure that people are not bamboozled by somebody who has a bunch of credentials. Well, and I think the district court addressed that. The question was whether the testimony was so unreliable that it should not be admitted. And the district court found that it was reliable enough. Yes, it was somewhat shaky, but it was not so unreliable that it shouldn't go on to the jury. And the reason for having made that finding, as the district court then said, the proper method for addressing reliable enough, but still somewhat shaky evidence, is through rigorous cross-examination. And then it becomes a question for the jury how much weight to give to that testimony. Did the expert testify at the Daubert hearing? Yes. It wasn't just based on reports? No, the expert testified. And was the shakiness, did the judge say it was shaky because the levels of opioids measured, the level of hydrocodone measured for Mr. Pearson was below 2.0 nanograms? Was that the sole reason it was shaky, or were there other reasons he said it was shaky? Well, the hearing, there were sort of two separate issues addressed during the hearing. One was the cutoff levels in workplace drug testing and the level of hypomorphone. And then the separate issue was the study and the screening and the samples that were considered in the study containing 2.0 nanograms or above of hydrocodone. I believe the fair rating of the district court decision was that the somewhat shaky did have to do with the testimony about the liability of the study as applied to Mr. Pearson's hair samples and the issue of the level of hydrocodone in those hair samples. And the fact that he was below... Go ahead. Let me... Yes, of course. So at trial, the expert then corrected his testimony at the Daubert hearing and said that there were sufficient opioids that it would satisfy the criteria for the study or not? No, no. The expert's testimony was consistent. What the expert said was, and he was questioned about this extensively through vigorous cross-examination at trial, yes, we don't dispute or claim that the study included samples with a level of hydrocodone less than 2 nanograms. But the expert was asked about this issue and what he said was the study could reliably be applied to Mr. Pearson's samples because the level of opioids in Mr. Pearson's samples, adding up the hydrocodone and hydromorphone, yielded a concentration of greater than 2 nanograms. And so in his opinion, in his expert opinion, that meant the study results about the concentrations could reliably be applied to Mr. Pearson's hair samples. Did he testify to that effect in the Daubert hearing? That is, the aggregation of hydrocodone. I believe he did. There was less questioning at the Daubert hearing than cross-examination at trial, but I believe he did. So even the proposition that even if you're below the concentration of hydrocodone, but if you aggregate the hydrocodone and the hydromorphone, you get above 2, and that would satisfy the study. He said that in the Daubert hearing. And yet, the district court still said, I conclude, however, the fact that the concentrations of hydrocodone in Mr. Pearson's hair samples were slightly below the minimum concentration of samples includes the study, does not make his testimony unreliable. At best, at most, this makes the testimony somewhat shaky. He did say that. He had this aggregation theory in front of him in the Daubert hearing and still says it's somewhat shaky. He did, and the question for this court is whether the district court abused its discretion, because at that point it's an abusive discretion standard, in concluding that the study was reliable enough to present this testimony to the jury and that the proper method for dealing with the somewhat shakiness of it was through cross-examination, which did occur at trial. You had a question? No, go ahead. Reliable enough, it sounds like, you know, good enough for government work. Well, I would object to that, but as a government attorney. But we also have an argument that we have a harmless error argument with respect to this testimony, that even if the district court did abuse its discretion in admitting this particular piece of testimony, the error was harmless, and that harmless error argument was based on all the other evidence that the jury heard relating to Mr. Pearson's diversion of hydromorphone on that date. And at least in his reply brief, he seems to concede that the evidence shows that somebody tampered with the vials of hydromorphone that were found in the particular machine on that night and then later tested. His claim is that there wasn't sufficient evidence without the testimony of Dr. Paulson to show that it was him. As we argue in the brief, there's a plethora of evidence, both the red flags that were testified to by Dr. Cox a little bit, but really by Dr. Day. Well, Dr. Cox is talking about red flags, just red flags, not an opinion of ingestion of hydromorphone, right? Well, yes, yes, correct. But Dr. Cox gave an opinion as it relates to diversion, and this is very different, and there's something going on here. Something going on here, I think you agree, would be his claim that it was diversion, right? Yes, but the question, he was charged with diversion, not ingestion, and so... Well, I'm asking the nature of the opinion now, and the point is, as it relates to Dr. Cox, we're talking about whether it was lay testimony or whether it was expert testimony. He opined that there was something going on here. It was very different, and that something going on, in his view, was diversion. Yes, that's correct, and I'm happy to address that question, although our position... Did he testify that he, in his opinion, there was diversion, or in his opinion, there was something going on that required... It was a very general statement. It was one sentence that, in his opinion, there was something going on. Well, but I think Judge Holmes was pointing out earlier that that was part of an earlier... It was, and it was in response to the claim, aren't there false positives when you have the red flags? And he said, no, not in this case, that this is very different. There was something going on here. I mean, at least the natural import of that statement to me was that something going on was this is not a false positive. This is diversion. This is an indicator of diversion. I mean, didn't see him shoot up, but I mean, it's an indicator of diversion, right? Yes. Okay. Do you have that testimony handy? We say that... I'd be interested in hearing the question before that. Well, the question... Well, what the exchange was before he said there was something going on here. I'm sorry. I'm interested in having the context because perhaps in context, it was tantamount to saying there was diversion. If you just look at the one sentence, it sounds like a red flag. So what's the exact... I can try to find it. It was on a recross. I've got... Paulson, I don't have a transcript. I can't find my transcript. I have the transcript. I'm just trying to find where it is. Here it is. Could you please read it to us? Yes, sure. He says... What line are you on? What page and line? I am under volume 291. I think we're going to get there in a second here. Okay. He says, question. And if there were other issues in flags, nevertheless, there may be instances where there's no diversion going on whatsoever. Correct? Dr. Cox says, there are. This was very different, and it was very clear that there was something going on. Right. Yes. I would just point out here that I believe our harmless error argument, we make it in two separate parts of the brief in response to two separate claims. Our position is that if you take out the testimony, both of the challenge pieces of evidence, the opinion of Dr. Paulson, and also this one-sentence opinion of Dr. Cox, which Dr. Cox's testimony was echoed and expanded upon by Dr. Day, and there was no challenge to any of Dr. Day's testimony. At the end of Dr. Day's testimony, he says something, I don't have the exact language, but something like, I was so concerned I brought it to the attention of the diversion task force. And so a harmless error argument, even if you take out both pieces of evidence, we think that there's sufficient evidence to support the conviction. Okay. We also. Well, that's not the test, is it? The test is whether it's harmless error, and the fact that there's sufficient evidence doesn't mean that this additional evidence did the trick in getting the conviction, so it wouldn't be harmless. Well, the test is whether there's sufficient evidence to support the conclusion that these pieces of evidence didn't make a difference in the conviction. Okay. Maybe that's right. It's a little. We don't think either of these pieces of evidence, either considered on their own or cumulatively, made the difference in the conviction. All right. Let me get this straight. Cox is not an expert. You're not calling him an expert? No. He is an observant witness, correct? Yes. As an observant witness, is he qualified to conclude there was diversion? We believe he was qualified to say there was something going on. That's not my question. My question is, is he qualified as an observant witness, not an expert, to conclude there was diversion? That's a simple question. Yes or no? Well. Not well. Yes or no. Well, based on his experience. But he didn't testify here. Finish your sentence. Are you saying then that he was qualified as an observant witness to conclude there was diversion here? I believe so. But I would also like to point out that that's really not. He was testifying about diversion. But his opinion was more general. He didn't say, I concluded there was absolutely diversion. The other half of the question is, he may be qualified to do so, but he never testified. He concluded there was diversion. He concluded there were red flags and beyond red flags, correct? He concluded that the red flags were suspicious. Did he testify that it was his conclusion there was diversion? No. Okay. Now, this testimony, the challenge, that was on recross, it looks like. Yes. Does that make a difference? Was it elicited by defense counsel? Well, there is an argument, yes, that we didn't make in the brief. But defense counsel was trying to elicit the testimony that there were red flags. And so in terms of this lay expert distinction, it's unclear what the difference would be between his opinion that. I thought the defense counsel was trying to say the fact that there are red flags didn't mean diversion. Right. He was trying to get him to say that. And he lost that. He made a mistake and got the witness to say no in this case. I don't think it. Yes. So if what Dr. Cox said was expert testimony, presumably if what defense counsel actually wanted him to say would have been subject to the same objection, it's also expert testimony. All right. So you're saying he opened the door because an answer to the question would be yes or no. And because he elaborated on that, that's the cross-examiner's fault for opening the door. Well, we didn't make that argument in the brief. I was just responding to the question. Our real argument is that it was lay testimony and that it makes no difference. I would hesitate to ask another question, but I will. Go ahead. This relates to James River. Yes. And when I looked at that again as recently, I guess, as last night, I was struck by the notion that one of the arguments that was made there was that Mr. Miller, because he had a real estate background, could opine on these matters in a better way, essentially. And we said, well, that doesn't really help your argument that it is lay testimony. In fact, that hurts you because that means he was situated to import his specialized knowledge. And it occurred to me, why isn't that Dr. Cox? I mean, even if you take the argument that I was essentially making, that Dr. Cox does this for a living, the reality is that made him even better able to communicate this based upon the specialized knowledge that he has in doing this for a living. So why isn't he like Mr. Miller in James River because of that? Because Mr. Miller in James River wasn't testifying about observations he made as part of his job in the course of his employment. He may have had background. But in this case, Dr. Cox, his job is looking at these ADS systems and records. And so we think this case is more like, I believe it's the Valencia case, but I think it's cited in the commentary to Rule 701, where those risk assessments, the person who was testifying, that's what he did as his job in the course of his employment. He performed these risk assessments, and that's what he was testifying to. I don't believe in James River, Mr. Miller. He may have had a background, but he wasn't testifying to observations made in the course of his employment. The language says he was especially suited of the opinion 1210. He was especially well suited to value property that his company owned and that he had inspected. So it's not like he wasn't out there. It's not like they didn't own it. So it's not like he was imported in here just to offer expert testimony. He was intimately familiar with the property, arguably just like Dr. Cox is intimately familiar with diversion. He testified, and we said, that it actually hurts you that you've got a guy who has a background in this, and Dr. Cox has got a Ph.D. in this stuff. Right? Well, but I think the difference is in James River, wasn't he testifying about depreciation rates? Yes. So he may have owned the property and been on the property, but he was importing his background knowledge in economics and depreciation rates into an evaluation of his own property. That's not here. Dr. Cox was forming an opinion based on his job looking at these ADS reports and conclusions he drew solely from looking at, he may be a doctor and have a background in this, but that's not what informed his opinion. What informed his opinion was knowledge gained in the course of his employment looking at these reports. And I think that's what distinguishes it from James River, where Mr. Miller was relying not on knowledge gained in the course of his ownership of the land, but background knowledge on depreciation rates, which I think another distinction that can be drawn is depreciation rates. The court said in James River that it's very complex. It's very hard to understand depreciation rates. I think there's an argument here that this was, if you look at those charts, Mr. Pearson was dispensing hydromorphone. His numbers were twice the numbers of everybody else in that chart. And so that's maybe a little bit easier to understand for a lay person than depreciation values. Why don't we stop there? All right. Thank you. Okay. Thank you, counsel. That was excellent arguments on both sides. Cases submitted, counsel excused.